MILL OWNERS MUTUAL FIRE INSURANCE COMPANY, Appellant, v. WILLIAM W. PETLEY, Administrator, et al., Appellees.

No. 39738.

1086

*Clark, Byers & Brunk* and *William L. Hassett,* for appellant.

*Stewart & Hextell, John L. Gillespie,* and *James M. Stewart,* for William W. Petley, appellee.

*Utterback & Forrest,* for Charles E. MacMahon, appellee.

Kindig, J.—On December 21, 1927, the plaintiff-appellant, Mill Owners Mutual Fire Insurance Company, commenced an action against Isobel Gray MacMahon and Charles E. MacMahon, defendants and appellees, to foreclose a real estate mortgage on 275 acres of land in Polk County, securing a note in the principal sum of $27,500, with accrued interest. Such mortgaged land is located near Youngstown, which is just outside the Des Moines city limits, and one and one-half miles from a street car line. Originally this mortgage was given by the appellee Mrs. MacMahon to the Security Loan & Investment Company of Des Moines, under date of January 22, 1924, and was assigned by the Security Loan & Investment Company to the appellant February 2d thereafter. When the mortgage was executed by the appellee Mrs. MacMahon, she and the appellee Mr. MacMahon were husband and wife. Execution, however, as before suggested, was made by Mrs. MacMahon only.

By way of answer, the appellees admitted the mortgage indebtedness, but pleaded that 40 acres of the property constituted their homestead, and consequently were exempt from execution, because the husband did not sign the mortgage.

A reply was filed to appellees' answer in the district court, attempting to avoid the homestead defense, because: First, the homestead, as such, was abandoned before the mortgage was executed; second, the said Isobel Gray MacMahon and Charles E. MacMahon, before their marriage, entered into a prenuptial agreement whereby the homestead was waived; and third, the husband and wife, through their acts, estopped themselves from claiming the exemption. As previously indicated, the district court held that appellees' answer set up a good defense. Accordingly, foreclosure of the mortgage against the homestead was denied. Subsequent to the trial, judgment, and decree in the court below, Isobel Gray MacMahon died, on May 27, 1929. Hence, the appellee William W. Petley was appointed administrator of her estate, and duly substituted as a party appellee here.

Through a motion based on newly discovered evidence filed in the district court after judgment, the appellant sought a new trial, on the supposition that the will of the appellee Isobel Gray MacMahon, left at her death, constituted such evidence. This redress was also refused by the court below. So we are asked to review, not only the original judgment and decree, but also the denial of the new trial.

I. Was the 40-acre tract, claimed as exempt, in fact a homestead at the time the mortgage was executed? That is the first question. Appellant insists that the homestead was abandoned before the mortgage was executed. The facts will settle the dispute.

Formerly, Isobel Gray MacMahon was Mrs. L. B. Gray. Three children were born to the Grays. L. B. Gray died in Chicago, Illinois, in 1912. At that time he owned the real estate  now covered by the mortgage. Said farm land was devised to the appellee Isobel Gray MacMahon through Gray's will. Appellee Charles E. MacMahon later became Mrs. Gray's second husband. Mrs. Gray, now Mrs. MacMahon, the appellee, continued living in Chicago with her three children until sometime in 1916, when she and the children moved to the farm in question. Mr. Gray, before his death, had contemplated building a home on this farm. Excavation for a house had been made by him. Also, some timber had been cut, for the purposes of the improve-

ment. For the purposes of carrying out the idea entertained by her husband before his death, Mrs. Gray built a stucco bungalow on said site previously selected by Mr. Gray before his death. After the house was completed, the appellee, then Mrs. Gray, lived on the farm with her three children.

Thereafter, on December 1, 1920, Mrs. Gray married the appellee Charles E. MacMahon. Henceforth, the appellees, as husband and wife, together with the three children aforesaid, continued to live on the farm. Dispute arises concerning some of the subsequent facts.

Contention is made by the appellant that, soon after the marriage between MacMahon and Mrs. Gray, the latter purchased a home in Des Moines, at 1425 Thirtieth Street, and moved into it. In addition thereto, Mrs. MacMahon bought a duplex, located on the east side of Des Moines, "where she also lived part of the time." All three properties, including the farm, the Thirtieth Street house, and the east-side duplex, were used by appellees for rental purposes.

Continuing the statement of its theory, the appellant suggests that Mrs. MacMahon had always lived in a large city, was educated, possessed a large library, and was unaccustomed to the country life. It is concluded, therefore, that she intended the city to be her home, and that the farm was used merely as a means to raise money with which to buy the town property. Reference is made by appellant: First, to the Polk Directory, which shows the residence of Charles E. MacMahon, the appellee, as 1425 Thirtieth Street in 1923, and occupation "real estate;" and second, to the school records of Des Moines, indicating the residence of the MacMahons likewise as 1425 Thirtieth Street for the years 1923 and 1924.

Again, it is said by the appellant that, before Isobel Gray became Mrs. MacMahon, she and the appellee Charles E. MacMahon entered into a prenuptial contract relating to the property under consideration, but in that agreement, which will hereinafter be discussed, the farm is not expressly referred to as a homestead. Thus appellant would have us infer that the parties to the prenuptial agreement did not consider the farm land as a homestead. Furthermore, appellant refers to the fact that two previous mortgages were put upon this land, and the money used to buy the city property, where the appellees might live,

and educate the three children. Education for the children, appellant suggests, was the underlying thought of Mrs. MacMahon throughout all these transactions. Finally, appellant asserts that the appellee Mrs. MacMahon went to California for her health, and there died. She left a will, however, conveying the farm to a trustee for the use and benefit of the children. Express reference in the will is made to the prenuptial contract, and that because thereof, the appellee Mr. MacMahon is to have no interest in the property. Therefore, it is argued that Mrs. MacMahon, when making the will, did not consider the farm a homestead in which her husband, Mr. MacMahon, had any interest. Such are the theories, inferences, and arguments advanced by appellant.

To overcome the foregoing suggestions of appellant, the appellees offer the following facts: First, they say that the record is not clear concerning when the appellee Mrs. MacMahon purchased the town property, but apparently the same was bought after the mortgage in question was executed. However that may be, it seems there were two houses on the land. A tenant lived in one, and the appellees resided in the other. During all the time under consideration, appellees had their furniture and cooking utensils in their home on the farm. Whatever time was spent in Des Moines was temporary in its nature, and the purpose of the Des Moines residence was to accommodate the children during those periods of the year when the weather was most disagreeable and the roads most impassable. Some time was spent by the appellee Mrs. MacMahon in the duplex, for the purpose of renting it, and she was in Des Moines part of the time to receive medical treatment for a goiter with which she was afflicted. Mr. MacMahon always lived on the farm.

At this juncture, Mrs. MacMahon testified:

"The farm was always to be the home. When the boys grow bigger, I expect to let them take it over. My youngest boy is looking forward to that now. I never intended to move away from there permanently or make my home any place else. It has been my home continuously and permanently. I have never changed my idea about that as a home. I have always tried to hold it for a home. From 1916 until 1925, I resided continuously out there on the farm. I did not even have a ride, for five or six years, from it. I lived continuously on the farm from 1916

until after 1925. [There were temporary residences in Des Moines and California thereafter.] I was out there living when I took this mortgage. * * * We did not rent our home or anything, but we rented part of the farm on shares to Mr. Seymour, and lived there in the other house. We always kept enough there so that the family could live there,—furniture and stove. We never have left it as a home.''

Likewise, Charles E. MacMahon said:

''I don't know who gave the publishing company [Polk Directory] my name. I was farming this farm. I sometimes phoned my wife, who was being treated in Des Moines for goiter. The phone was either in her name or in my name. I usually drove the children in and out [from the farm to Des Moines and back again] from East High [the school which they attended]. The nearest street car was the Fair Ground, one mile and a quarter or two miles. When the roads were soft in the spring, and during the blizzards in the winter, the children could not make it. My wife would come to Des Moines, and the boys would go to school, and I would stay right on the farm. After the boys were through with school work, they would go to the farm and spend the summer. I never intended to make my home any other place. I was there up to the first of March, 1928.''

Corroboration for appellees may be found in the testimony of I. E. Daniels, a store keeper at Youngstown, who said:

''I know that MacMahons [appellees] lived on the farm until the first of this year [1928].''

No direct evidence was offered by appellant to contradict the testimony of appellees' witnesses. Theories alone are brought forward to overcome the express declarations of those testifiers. Inferences to be drawn from such facts as the before mentioned previous mortgages on the home farm, the antenuptial agreement, and the will (consideration is given to the will here, not because it was introduced in evidence at the trial, but in contemplation of the motion for a new trial because of newly discovered evidence), are not enough to overcome the direct and positive testimony of appellees' witnesses.

Manifestly, there is ample evidence to show that the property claimed as exempt was in fact a homestead at the time the mortgage was made, January 22, 1924. When the conflicting evidence is fully considered and weighed, the preponderance is in favor of the homestead existence. Regardless of where the burden of proof may be in showing that the removal from the homestead was temporary, the evidence, on the whole record, is sufficient to establish appellees' claim. Obviously, when all the facts are considered, there was in truth no removal from the homestead, in the sense that the exemption right was abandoned. Clearly, the residence of the appellee Mrs. MacMahon in Des Moines was merely for temporary purposes. Wherefore, under all the circumstances, the homestead did exist, and was not abandoned during the time in question.

II. Assuming, without conceding, the existence of the homestead when the mortgage was made, appellant maintains, nevertheless, that the property in question was not exempt, because of  said prenuptial agreement between the appellees Mr. and Mrs. MacMahon. To put the thought in another way, appellant urges that, through the prenuptial agreement, the appellee Charles E. MacMahon waived all rights of every kind in and to the real estate. Resultantly, it is contended that said appellee's homestead rights were included in such relinquishment. With that fact as a major premise, the appellant then argues that it was not necessary, in any event, for the appellee MacMahon to sign the mortgage.

Replying to that proposition, appellees maintain: First, that, because appellees, at the time the mortgage was executed, were husband and wife, and both living together with the three children on the homestead property, it was absolutely essential that both the husband and wife join in executing the mortgage; and second, that, regardless of that, the appellee Charles E. MacMahon did not, through the antenuptial agreement, waive his homestead rights. Section 10147 of the 1924 Code provides:

"No conveyance or incumbrance of, or contract to convey or incumber the homestead, if the owner is married, is valid, unless the husband and wife join in the execution of the same joint instrument, whether the homestead is exclusively the subject of

the contract or not; but such contracts may be enforced as to real estate other than the homestead at the option of the purchaser or incumbrancer.'' (This section is differently phrased in the 1927 Code.)

Must both husband and wife, under the circumstances here involved, sign the mortgage, even though one of them has relinquished his right to the homestead through a prenuptial agreement? It is claimed by appellees that both must sign if the family is to be deprived of the homestead during the lifetime of the fee owner. Public policy is involved, appellees suggest, and therefore the family, during the lifetime of the husband and wife, cannot in any manner or way be deprived of the homestead except through a contract jointly executed by the husband and wife. A different situation arises, appellees state, after the fee owner dies, and the party who waived under the prenuptial contract asserts his homestead rights. However that may be, we find it unnecessary to decide the point at this time. Hence we assume, without deciding, that the property is subject to execution if the homestead right of the appellee Mr. MacMahon was waived in the prenuptial contract. This makes necessary a discussion of the second proposition set forth in appellees' reply.

Did the appellee Charles E. MacMahon waive his homestead rights in the prenuptial contract? That agreement, so far as material, is as follows:

''That whereas, said parties [Charles E. MacMahon and Isobel Petley Gray] have agreed and intend to enter the marriage relation: Now, therefore, in consideration of said agreement, on the part of said parties each to marry the other, it is hereby agreed by and between said parties, that their property rights and interests shall hereafter be governed by the terms and conditions of this agreement as hereinafter set out, so far as the same shall relate to the property herein described or mentioned.

''First: It is hereby agreed and understood that the said party of the first part [Charles E. MacMahon] shall have no right, title or interest in and to the farm property now owned by the said second party [Isobel Petley Gray], conveyed to her by L. B. Gray * * * But that upon the death of said second party, all said real [property] now owned by her or the proceeds therefrom, whether said property has been sold and proceeds re-

invested in other property or not, and in whatever form said property shall be at the time of her death, the same shall descend to the heirs at law, or the devisees and legatees of the said second party, free and clear, and not subject to any claim of the first party, for dower rights or distributive share or interest therein, and the said first party hereby expressly waives and renounces any and all claim to any right or interest in or to said property or the proceeds therefrom.

"Second: It is further agreed by said parties, that the second party shall have the right at all times to invest any or all of the rents and profits and proceeds from such real estate in maintaining the improvements now on said property, or in making new improvements thereon as she may decide at any time to do.

. "Third: All other property now or hereafter owned by either of said parties shall not be affected by this agreement, but the same shall be governed by the laws of the state or county in which said property may be situated * * *"

At the outset we recognize that a homestead right here does not involve title. Prominent among the characteristics of the prenuptial contract is the fact that it does not expressly mention the homestead. That contract primarily involves title. If, then, the appellee Mr. MacMahon released or waived his homestead rights, it was because of the general language contained in the document. Express waiver or relinquishment of the homestead was not made by said appellee. Implication alone is left, to supply a waiver or relinquishment. Reliance is made by appellant at this juncture upon the language contained at the end of the first section of the prenuptial contract above quoted, which reads as follows:

"And the said first party [the appellee Charles E. Mac-Mahon] hereby expressly waives and renounces any and all claim to any right or interest in or to said property or the proceeds therefrom."

Such language is all-inclusive, appellant declares, and necessarily, therefore, embraces the homestead. On the other hand, appellees explain the general language contained in the sentence quoted by limiting its reference to the appellee Charles E. Mac-

Mahon's dower or distributive share, previously mentioned in the agreement. We are constrained to agree with this.

Underlying the intent of the prenuptial agreement was the fundamental desire to prevent the appellee Charles E. Mac-Mahon from having a dower right or distributive share in the property owned by the appellee Isobel Gray MacMahon. She desired that the property aforesaid should descend or go by devise to her heirs at law, the children before mentioned. Parenthetically, it is again noted that this property had come to Isobel Gray MacMahon from her first husband, the father of the children. Evidently the mother did not desire Charles E. MacMahon, her second husband, to receive ''a dower right or distributive share'' therein. So, when the quoted sentence was used, the MacMahons, by means of the general language therein contained, referred back to ''dower right and distributive share.'' *Mahaffy v. Mahaffy*, 63 Iowa 55; *Plistil v. Kaspar*, 168 Iowa 333. In the *Plistil* case we said (on pages 337 and 338):

''What effect upon this controversy is to be given to the antenuptial contract? It does not in terms make any mention of homestead or homestead rights, nor do we think it should be held that the relinquishment of such right was intended or was in the contemplation of the parties in making the contract. The homestead right is a favorite of the law, and its surrender or waiver will not be presumed, nor will such intent be inferred from the use of words of a general and indefinite signification. This question was before the court in *Mahaffy v. Mahaffy*, 63 Iowa 55, in which case it was held that the wife's antenuptial contract, providing that, in consideration of payment to her of a stated sum, she expressly renounced all claim, right, title, and interest in the estate of her husband by reason of her relation as his wife or widow, did not operate to defeat her right of homestead.''

Material language of the antenuptial contract discussed in the *Plistil* case was:

''* * * and the survivor of them [the parties to the antenuptial contract] is not to have any right, claim or interest in the property of the deceased one.''

That language is just as strong as the terms used in the

prenuptial contract in the case at bar. Phraseology embraced in *Mahaffy v. Mahaffy* (63 Iowa 55), supra, was much more indicative of an intention to include the homestead than that presented here. There the language was:

"I [the one relinquishing] hereby renounce and relinquish all claim, right, title and interest therein [the other party's property] by reason of the said relation of wife or widow of the said Mahaffy."

A quotation from the *Mahaffy* case will enlighten the reader. It is (pages 63 and 64):

"The covenant of Mahaffy, as expressed in the language immediately following. the preamble, is, 'that, after my death, there shall be paid out of my estate, to said Elizabeth Hutchinson, as my widow, the sum of six hundred dollars, * * * the same to be her dower and portion in full of my said estate, and in lieu and stead of any dower or rights of inheritance therein, given and created by operation of law.' And this is followed by an agreement on the part of said Elizabeth Hutchinson 'to receive and accept the said sum in full payment, and in entire and complete satisfaction, of all my rights of dower and inheritance as the widow and heir of the party of the first part [Mahaffy] in his said estate.' These provisions of the contract relate, beyond doubt, to the distributive share which she would have taken under the statutes of the state in his estate, and by them she is bound to accept said sum of money in satisfaction of her right of inheritance in the estate. But this, we think, is the extent of these provisions. The right of the wife to continue in possession and occupancy of the homestead, after the death of the husband, is not a right or interest in his estate which she takes by inheritance, but is entirely distinct from the interests which she takes by virtue of that right. It is a mere personal right to occupy and possess the premises, but is unaccompanied by any title or property interest therein. It does not accrue with the death of the husband, nor is it enlarged or otherwise affected by that event. She had the right to the same extent during his life, and the statute * * * simply continues it after his death. We think, then, that defendant did not relin-

quish her right to occupy and possess the homestead by the provisions of the contract last quoted."

Continuing on page 65, the court said:

"The clause [the one using the general language] in question ought, we think, to be construed with reference to the clauses which precede it; and the sense in which the words are used is also to be determined very largely by those preceding clauses."

Likewise, in the present controversy, the MacMahons, by using the general inclusive language at the end of the first section in the contract, referred to the previous specifically mentioned "dower right and distributive share." Any other construction would be contrary to the manifest intention of the parties. Unless the language is plain and unmistakable, we should not conclude that the parties, through mere inference or uncertain implications, meant that a homestead right should be waived or relinquished. The MacMahons in the prenuptial contract in different places said that the appellee Charles E. MacMahon "shall have no right, title, or interest" in and to the farm property; but elsewhere within the instrument, it is plain that the parties intended thereby to refer to dower right and distributive share. Plainly, the appellee Charles E. MacMahon did not waive or relinquish his homestead right in this land. Necessarily, then, the mortgage in question was not valid so far as the homestead is concerned. The husband and wife did not sign the same joint instrument. Only the wife signed; the husband refused to do so. Without the "joint execution," the mortgage, under the statute, was invalid, so far as the homestead is concerned, and the district court properly allowed the exemption.

III. Estoppel was pleaded, but evidently the proposition is abandoned in the arguments now presented. Whatever the situation may be in reference to the argument in that regard, a study of the record makes it manifest that estoppel was not proven.

Concerning the estoppel, appellant says: First, that in the application for the loan there was a statement indicating possession of the farm by a tenant; and second, that, during the negotiations for the loan, the appellee Charles E. MacMahon

stated that he had no interest or right in the farm, because of the antenuptial contract, and therefore it was not necessary for him to sign the mortgage. Other facts are recited in connection with this subject-matter, but, so far as material, mention has been made of them in the previous discussion. Repetition is not necessary at this place.

Considering those alleged items of estoppel in the order named, attention is first directed to the application for the loan. While it is true the application indicated that a tenant was on the farm, yet, under the whole record, it appears that there were two houses on this land. One was occupied by the tenant, and the other by appellees. Title examiners, in a letter to the mortgage company before the loan was made, said: "We are informed that this land is the homestead of the borrower and her husband." Moreover, the address of Mrs. MacMahon, the appellee, given the mortgagee in said application was R. F. D. Number Five, which is the mail route running past this farm. No deception was practiced by the appellees in that respect.

Next in order for consideration is the alleged item of estoppel growing out of Charles E. MacMahon's purported statements that he had no right or title in the farm. Explanation is made by the appellee Charles E. MacMahon concerning what he really said to the original mortgage company when the loan was obtained. Examiners of the title advised the original mortgagee concerning the possible homestead rights of Mr. MacMahon. Said MacMahon himself flatly refused to sign the mortgage, upon request. His explanation regarding what was said at the time varies considerably from the testimony of the witness who handled the transaction for the mortgage company.

When fairly considered, the evidence indicates that Charles E. MacMahon did not deny his homestead interest in the premises. Attempts were made by him, during the conversation with said loan company's agent, to inform such representative that through the prenuptial agreement the dower right and distributive share named therein were waived. These men were laymen, and perhaps did not understand the technical significance of legal terms. Under all the circumstances, therefore, a court of equity cannot say that Charles E. MacMahon said or did anything during the negotiations in question which now estops him from claiming a homestead right in the property.

The statements and actions of Charles E. MacMahon, just discussed, and all his other statements and actions shown in the record, taken as a whole, do not estop appellees from claiming the homestead. We do not concede or decide that Mr. MacMahon alone, in any event, could, through his conduct, estop the family from having the homestead. By express statutory requirement, an instrument must be jointly executed by the husband and wife, in order to bar the homestead. What we do determine is that in no event was the evidence here sufficient to create an estoppel. But upon the general subject of oral release of the homestead right by a spouse, see *Pagel v. Tietje*, 193 Iowa 467; *Keeline v. Clark*, 132 Iowa 360; *Singleton v. National Land Co.*, 183 Iowa 1108; *Seiffert & Wiese Lbr. Co. v. Hartwell*, 94 Iowa 576.

IV. As a final proposition, appellant urges that it is entitled to a new trial because of newly discovered evidence. Such alleged newly discovered evidence is the will of the appellee  Isobel Gray MacMahon, who died, as before suggested, after the trial, judgment, and decree in the district court. Her death occurred in Los Angeles, California, on March 2, 1929. In effect, the will attempts to dispose of the testator's separate property. Special declaration is made in the instrument that the husband, Charles E. MacMahon, the appellee, is not a beneficiary under the will because of the antenuptial agreement aforesaid. Mrs. MacMahon's three children are the beneficiaries. Paragraph five contains this statement: •

"Under no consideration do I want my husband to participate in my estate, nor do I want him to act as trustee or guardian in any manner."

William W. Petley was named as executor and trustee. All of Mrs. MacMahon's property was devised to the trustee for the benefit of said three children. Homestead, as such, is not mentioned in the will. It is claimed by appellant that the will, not known at the original trial, is newly discovered evidence, and as such is material in determining the intention of the parties in executing, and the interpretation placed by them upon, the prenuptial agreement.

Apparently it is appellant's idea that, if the prenuptial contract had not intended to preclude the appellee Charles E. MacMahon from claiming the homestead, the will would have recognized his homestead right in the property devised. Obviously there is not here presented such newly discovered evidence as will entitle the appellant to a new trial. Assuming, first, that the will may be considered for the purposes suggested by the appellant, yet it cannot overcome the express provisions of the prenuptial contract, as previously interpreted. Anyway, the appellee Isobel Gray MacMahon in her will, as before indicated, did not provide that her surviving husband, Charles E. MacMahon, should not enjoy the homestead. A homestead right is created by statute, not devised by a will. Undoubtedly the testatrix so understood when her will was executed. Hence there is little, if anything, in the provisions of said will which could in any way throw light upon the intention of the parties when they made the prenuptial contract. Whatever the facts may be in that regard, the will does not constitute such material and sufficient evidence as to change the result of the trial. We have considered the will when arriving at our conclusions hereinbefore indicated.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

MORLING, C. J., and EVANS, FAVILLE, and GRIMM, JJ., concur.